**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

SCOTT NIVER,

       Plaintiff,

vs.

TRAVELERS INDEMNITY
COMPANY OF ILLINOIS,

       Defendant.

No. C 01-3064-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING THE
DEFENDANT'S SECOND AMENDED
AND SUBSTITUTED MOTION FOR
SUMMARY JUDGMENT AND THE
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

––––––––––––––––

**TABLE OF CONTENTS**

**I. INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    **A. Factual Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    **B. Procedural Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**II. LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
    **A. Standards For Summary Judgment** . . . . . . . . . . . . . . . . . . . . . . 12
    **B. The Purported Change In The Law** . . . . . . . . . . . . . . . . . . . . . 14
        **1. Arguments of the parties** . . . . . . . . . . . . . . . . . . . . . . . 14
        **2. The Bellville decision** . . . . . . . . . . . . . . . . . . . . . . . . . 18
        **3. The import of Bellville** . . . . . . . . . . . . . . . . . . . . . . . . 19
            **a. Articulation and application of pertinent standards** . . . 19
                **i. Reliance on prior or new authority** . . . . . . . . 22
                **ii. Comparison to the opinion of the Iowa Court of**
                      **Appeals** . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            **b. The scope of any modification of the applicable**
                **standards** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
            **c. Subsequent application of Bellville by the Iowa Court**
                **of Appeals** . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    **C. Application Of The Standards** . . . . . . . . . . . . . . . . . . . . . . . . 35
        **1. Arguments of the parties** . . . . . . . . . . . . . . . . . . . . . . . 36

      2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
            *a.*    *The objective element* . . . . . . . . . . . . . . . . . . . . . 40
            *b.*    *The subjective element* . . . . . . . . . . . . . . . . . . . . 46
  D. **Remaining Issues For Trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

$\mathbf{I}$n this action for first-party bad faith for failure to pay workers compensation benefits, the defendant insurer asserts that, despite denial of its first motion for summary judgment, it is now entitled to summary judgment on the plaintiff's bad faith claim, owing to a change in Iowa law purportedly adopted in *Bellville v. Farm Bureau Mutual Insurance Company*, 702 N.W.2d 468 (Iowa 2005). The insurer contends that, under the new legal standards adopted in *Bellville*, the plaintiff's workers compensation claim was "fairly debatable" as a matter of law, so that the insurer's refusal to pay that workers compensation claim was not in bad faith. The plaintiff counters that there has been no change in the applicable law and that, in any event, he, not the insurer, is entitled to summary judgment on his bad faith claim. He asserts that, as a matter of law, his workers compensation claim ceased to be "fairly debatable" when all of the evidence pointed to a compensable basis for his renewed medical problems, and the insurer not only should have known, but did actually know, that it had no reasonable basis for continuing to deny his workers compensation claim. Consequently, the court must first determine whether there has been a change in Iowa law concerning claims for first-party bad faith failure to pay an insurance claim, then determine whether either party is entitled to

summary judgment on the plaintiff's bad faith claim under the applicable standards and what, if any, issues remain for trial.

## I. INTRODUCTION

### A. Factual Background

The court will not attempt here a detailed dissertation of all of the facts, disputed and undisputed, in this case. Rather, the court will present enough facts, disputed and undisputed, to put in context the parties' arguments concerning their motions for summary judgment.[1]

---

[1]Indeed, the defendant has not properly disputed any factual statements in the plaintiff's Statement Of Undisputed Material Facts In Support [Of] Plaintiff's Motion For Summary Judgment And Resistance To Defendant's Second Amended And Substituted Motion For Summary Judgment (docket no. 164-4), because the defendant's Response (docket no. 168-2) cites no portion of the record in support of any denials or qualifications as required by N.D. IA. L.R. 56.1(b). The defendant's notation that its Response is "in addition to, and is intended to supplement, the Statement of Undisputed Facts filed by the Defendant in support of its Second Amended and Substituted Motion for Summary Judgment filed November 22, 2005," and that the prior statement is "added and incorporated, as if fully set forth herein" does nothing to satisfy the requirement of N.D. IA. L.R. 56.1 that "[a] response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record." Hence, the defendant's "failure to respond, with appropriate citations to the appendix, to an individual statement of material fact constitutes an admission of that fact." N.D. IA. L.R. 56.1(b). Notwithstanding the authorization of the local rule to deem admitted all factual statements to which no proper response has been made, the court has, in an abundance of caution, perused the record with care to determine what facts are genuinely disputed between the parties and whether those factual disputes are material to the cross-motions for summary judgment on the

(continued...)

Plaintiff Scott Niver was formerly employed by Curries Manufacturing (Curries) in Mason City, Iowa. Defendant Travelers Indemnity Company of Illinois (Travelers) was and is the workers compensation insurance carrier for Curries. However, Curries itself had authority to decide whether to pay workers compensation claims up to a certain dollar amount, because of its "retention," *i.e.*, deductible. In 1995, Niver suffered a work-related hernia, for which he required hernia surgery and, some months later, exploratory surgery to release a nerve entrapped during the hernia surgery. Travelers accepted the 1995 hernia claim at the time without dispute and eventually paid both weekly and medical benefits. Travelers closed the file on the 1995 hernia claim on November 7, 1996, when Niver had not incurred any additional medical expenses for a period of two months. The parties do not dispute that the statute of limitations for any additional weekly benefits or penalty benefits on that claim ran three years later, but that Niver remained entitled to "lifetime" medical benefits on that claim, because weekly benefits had originally been paid.

In 1999, Niver suffered another work-related injury, this time to his knee, and submitted another workers compensation claim. The parties do not dispute that Travelers again paid weekly and medical benefits on the claim for the 1999 knee injury. Niver returned to work at Curries on October 4, 2000, after three months off to recuperate from knee surgery.

The central issue in the present dispute, however, is the compensability of a workers compensation claim for groin problems that Niver reported to Curries on October 12, 2000, just shortly after his return to work after his knee problems. Travelers received that

---

[1](...continued)
merits of the plaintiff's bad faith claim.

report on October 16, 2000. The parties agree that Niver had seen a doctor about the groin pain on October 4, 2000, and that he had begun experiencing some groin pain about two weeks prior to his return to work. The parties also apparently now agree that Niver did not report a new injury, but that the report of his complaint about groin pain that Curries made to Travelers nevertheless indicated a "date of injury" of October 12, 2000. Niver also demanded benefits, including weekly benefits, medical benefits, and, eventually, penalty benefits, that would only have been available for a new injury claim.

Travelers denied the claim for workers compensation benefits filed October 12, 2000, by letter dated October 26, 2000, stating that the denial was "based upon the information we received." Defendant's Appendix at 29. Travelers's claim notes for October 26, 2000, indicate that the basis for the denial of the claim was that Niver's pain started "about 2 weeks before his RTW [return to work]," so that the adjustor "d[id] not think that [Travelers] ha[d] a new work aggravation claim. . . ." Defendant's Appendix at 17. Notwithstanding denial of his workers compensation claim for the groin pain that he reported in October 2000, Niver underwent groin surgery on December 7, 2000. *See* Plaintiff's Appendix at 26. On December 25, 2000, Niver was treated for a hematoma at the site of the incision from the December 7, 2000, surgery, after presenting at the emergency room for bleeding and pain in the groin area. *See* Plaintiff's Appendix at 23. He continued to suffer groin pain after the surgery and other treatment in December 2000. *See, e.g.,* Plaintiff's Appendix at 22 & 29-32.

After his December 2000 surgery, Niver disputed Travelers's denial of his claim for workers compensation benefits for the October 2000 groin pain. Specifically, on March 14, 2001, Niver's attorney provided Travelers with medical records in reference to File No. 043-CB-AYW6895R, with Date of Injury 10/12/2000, as the pertinent claim was designated, on the ground that the medical records submitted made it "clear that . . .

the treatment for the groin is related to the original [1995 hernia] injury, and is work related." Defendant's Appendix at 30. The attached medical records were from examinations on October 12, 2000, November 6, 2000, and November 27, 2000. Travelers disputes whether the attached medical records showed definitively that the groin pain was related to the 1995 hernia claim.

The medical records from October and November 2000 do, indisputably, indicate that Niver's treating physician initially considered three possible causes for Niver's groin pain: (1) irritation of the iliolinguinal nerve that had been cut during surgery for the 1995 hernia; (2) a muscle sprain; or (3) a hematoma from Coumadin therapy related to Niver's knee injury. Defendant's Appendix at 31-32 (notes for October 12, 2000). The notes for the November 6, 2000, examination indicate that, while the treating physician continued to find that the "[e]tiology is not known," the source of Niver's pain was "unlikely to be a hernia," and could be a "possible nerve entrapment." Defendant's Appendix at 33 (notes for November 6, 2000). The notes for the November 27, 2000, examination reflect that, if pain injections continued to have little effect, exploratory surgery might be required, because Niver's "source of the pain may be the upper end of the divided iliolinguinal nerve causing some phantom pain." Defendant's Appendix at 34 (notes for November 27, 2000). The medical records for Niver's December 2000 surgery, which were also provided to Travelers on March 14, 2001, state that the surgery revealed that Niver had at least one branch of nerve that traversed what appeared to be a small neuroma, which was probably related to the surgery for the 1995 hernia, and that scar tissue from the prior surgery, which was present in a significant manner, had been released. Plaintiff's Appendix at 26. A subsequent pathology report, which Travelers also received on March 14, 2001, confirmed the presence of the neuroma. Plaintiff's Appendix at 28.

An adjustor for Travelers responded to Niver's counsel's March 14, 2001, letter by letter dated March 15, 2001. In her response, the adjustor stated, "Both the medical documents and the statement taken from your client indicated that his symptoms began before his return to work from his knee injury. Therefore, we do not feel that work has aggravated his recurrent hernia." Defendant's Appendix at 35. Although the adjustor noted the prior hernia claims in 1992 and 1995, she stated, "The last payment for the most recent claim was made in September 1996 therefore the statue [sic] has run out on that claim." Defendant's Appendix at 35.

The parties continued to exchange letters during the spring of 2001 concerning the cause of Niver's groin pain and whether it was related to the 1995 hernia, the subsequent knee problem, or to a non-work-related cause or injury. Niver also provided Travelers with medical records from the Mayo Clinic, where Niver had been treated for continuing groin pain in March and April 2001. Those records indicated the treating physicians' belief that the groin pain reported in October 2000 was probably at least in part the result of damage from the 1995 hernia surgery. Plaintiff's Appendix at 29-32. On July 20, 2001, Niver also provided Travelers again with the surgery notes and pathology report from the December 2000 surgery.

While the dispute over the workers compensation claim for the October 2000 groin problems was continuing, Niver was terminated from his position at Curries on June 15, 2001. Niver notes that, in a deposition, a Curries representative explained that Niver was fired, because Curries believed that his groin problem was not work-related and that he had missed too much work.

On June 28, 2001, Niver filed three petitions for workers compensation benefits with the Iowa Workers Compensation Commission, one asserting that Travelers should have paid workers compensation benefits for the groin problems in October 2000 under

the 1995 hernia claim, one asserting that benefits for those problems should have been paid under the 1999 knee claim, and one asserting that benefits for those problems should have been paid under a claim for a new injury on October 12, 2000. On July 2, 2001, Niver filed a petition in Iowa District Court for Cerro Gordo County alleging Travelers's bad faith failure to pay his workers compensation claim for the October 2000 groin problems. Travelers subsequently removed that action to this court. This action was stayed, however, pending resolution of claims in front of the Iowa Workers Compensation Commission.

The parties dispute when, exactly, an adjustor for Travelers requested that the file from the 1995 hernia claim be returned from storage. The parties do not dispute that one adjustor requested that the file on the 1995 hernia claim be returned from storage on July 3, 2001, but that same adjustor suggested in deposition that she had reviewed the 1995 hernia claim file for reopening on June 26, 2001. Another adjustor testified in deposition that she thought that she had ordered the file on the 1995 hernia claim soon after Travelers received Niver's counsel's March 14, 2001, letter, but there is no other indication in the record that Travelers actually requested, received, or reviewed the full file on the 1995 hernia claim until June or July of 2001.

Although Travelers continued to stand on its denial of Niver's claim for compensation for the October 2000 groin problem, for example, by letter dated June 26, 2001, *see* Defendant's Appendix at 68, the same adjustor who authored the June 26, 2001, letter also noted in the claim file on June 26, 2001, "Everything is relating the chronic pain to his prior hernia and surgery under the 1995 claim." Defendant's Appendix at 18. In July 2001, Travelers's adjustors began to focus on medical records relating the October 2000 groin problems to the 1995 hernia claim. Notes dated July 10, 2001, in the claim files for both the October 2000 claim and the 1995 claim state that everything about the

October 2000 groin pain, including medical records, related back to the 1995 claim. Defendant's Appendix at 3 (1995 claim notes stating, "[Injured worker] has new claim of 10-00 for an alleged incident causing a hernia but in all the medical he doesn't mention a new indicent [sic] but rather relates everything back to this claim.") & 19 (October 2000 claim notes stating, "All of the medical is relating the problems back to an old hernia claim that was closed in 1996."). On July 19, 2001, the adjustor made the following notation in the 1995 claim notes:

> Discussed this file with Jeff at insured [Curries]. Inquired why, when the newer claim was denied and all the medical was indicating the symptoms were related to this hernia claim, the medical wasn't paid under it. The statute has run on any indemnity but [injured worker] has lifetime medical. He wasn't sure. Will check with suprevisor [sic] Lefler when he returns to the office tomorrow.

Defendant's Appendix at 3. Further claim file notes dated October 26, 2001, February 18, 2002, and May 21, 2002, also indicate that Niver's claim for the October 2000 groin pain "should have" been paid pursuant to the 1995 hernia claim. *See* Defendant's Appendix at 4 & 7. Although the adjustors apparently recognized that the October 2000 groin problems might relate to the 1995 hernia claim, and indeed, eventually recognized that the October 2000 claim should have been paid pursuant to the "lifetime" medical benefits entitlement from the 1995 hernia claim, the parties dispute whether the claims adjustors had authority to settle the claim once litigation had started. In any event, despite the adjustors' belief that benefits for the October 2000 claim should have been paid pursuant to the 1995 hernia claim, Travelers continued to dispute Niver's claim for workers compensation benefits in the administrative proceedings.

In February 2002, Niver dismissed without prejudice his administrative petitions concerning the 2000 and 1999 claims. Thus, the administrative proceedings continued

only on Niver's claim for benefits for the October 2000 groin problems under the 1995 hernia claim. By decision dated November 20, 2002, the Iowa Workers Compensation Commission ordered Travelers to pay past and future medical benefits, mileage, and costs for the October 2000 groin problem pursuant to the 1995 hernia claim. *See* Defendant's Appendix at 197-203. An adjustor's claim notes for November 22, 2002, indicate that the outcome of the administrative proceedings was "no surprise." *See* Plaintiff's Appendix at 49. Although Travelers pursued an administrative appeal, Travelers also lost that appeal, and ultimately paid the administrative award on November 26, 2003.

## B. *Procedural Background*

As mentioned above, on July 2, 2001, Niver filed a petition in Iowa District Court for Cerro Gordo County alleging Travelers's bad faith failure to pay his workers compensation claim for the October 2000 groin problems. Travelers removed that action to this court on August 9, 2001. Niver filed a second amended complaint on May 1, 2002, and another amended complaint on June 10, 2002. This action was stayed, however, on September 17, 2002, pending resolution of claims in front of the Iowa Workers Compensation Commission. Notwithstanding the stay, Niver was allowed to amend his complaint again on January 2, 2003. The stay was lifted on December 16, 2003.

In its current form, Niver's Complaint alleges, in Count I, a claim of first-party bad faith for failure to pay workers compensation benefits for the groin pain that Niver reported in October 2000 pursuant to the 1995 hernia claim; in Count II, a claim for exemplary damages for the intentional, reckless or willful and wanton disregard of Niver's rights under the Workers' Compensation Act; and in Count III, a claim of first-party bad faith for pursuing an administrative appeal of the November 20, 2002, arbitration decision awarding Niver benefits for medical bills and expenses for the October 2000 groin problem

pursuant to the 1995 hernia claim. *See* Fourth Amended Petition At Law (docket no. 79). Travelers denies these claims and asserts various affirmative defenses. *See* Answer (docket no. 80). Trial is currently set to begin in this matter on March 6, 2005.

On August 2, 2004, Travelers filed an Amended And Substituted Motion For Summary Judgment, which the court denied by order dated March 11, 2005. Notwithstanding denial of its first motion for summary judgment, Travelers filed its Second Amended And Substituted Motion For Summary Judgment on November 23, 2005 (docket no. 163), which is the first of the dispositive motions now before the court. Travelers's motion is premised on a purported change in the law concerning proof of a bad faith claim in the interim between disposition of its first motion for summary judgment and the filing of its second such motion. Travelers asserts that the change in the law warrants summary judgment in its favor on the entirety of Niver's bad faith claim. On December 15, 2005, Niver resisted Travelers's motion (docket no. 164), and also filed his own Motion For Summary Judgment (docket no. 165), which if granted, instead of Travelers's motion, would leave only the issue of damages for trial. Travelers filed a resistance to Niver's motion for summary judgment on January 6, 2006 (docket no. 168). Niver filed a reply in support of his motion for summary judgment on January 10, 2006 (docket no. 169). The day before the oral arguments, Travelers filed its Supplemental Authority In Support Of Defendant's Second Amended And Substituted Motion For Summary Judgment (docket no. 173), bringing to the court's attention a post-*Bellville* decision of the Iowa Court of Appeals.

The parties both requested oral arguments on their motions for summary judgment. Therefore, the court heard such oral arguments for February 1, 2005. At the oral arguments, plaintiff Scott Niver was represented by Mindi M. Vervaecke of Fitzsimmons

& Vervaecke Law Firm, P.L.C., in Mason City, Iowa.[2] Defendant Travelers Indemnity Company of Illinois was represented by CeCelia Ibson Wagner of Smith, Schneider, Stiles & Serangeli, P.C., in Des Moines, Iowa. Like the parties' briefs, the parties' oral arguments were unusually thorough, well-prepared, and articulate.

The parties' motions for summary judgment are now fully submitted.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a prosecuting or defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims at issue. FED. R. CIV. P. 56(a) (summary judgment for claimant) & (b) (summary judgment for defending party). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable

---

[2]Niver is also represented by Bruce Braley of Dutton, Braun, Staack & Hellman in Waterloo, Iowa, but owing to technical problems with the telephone conference call for the oral arguments, Mr. Braley did not participate in the oral arguments.

inferences that can be drawn from the facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377 (same).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993).  When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995).  An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997).  Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable,

but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

Finally, "'[w]here the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate.'" *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996) (quoting *Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

The court will apply these standards to the parties' cross-motions for summary judgment.

## B. The Purported Change In The Law

The centerpiece of Travelers's Amended And Substituted Motion For Summary Judgment is that there has been a sea change in Iowa law concerning claims of bad faith failure to pay insurance benefits since the court denied Travelers's first motion for summary judgment, citing *Bellville v. Farm Bureau Mutual Insurance Company*, 702 N.W.2d 468 (Iowa 2005). Not surprisingly, counsel for the parties, zealous advocates that they are, have sharply contrasting views on the impact of the Iowa Supreme Court's decision in *Bellville*. The court will consider the issue of the impact of *Bellville* first, as that issue will determine the standards that the court must apply to Niver's bad faith claim.

### 1. Arguments of the parties

Travelers contends that, in *Bellville*, the Iowa Supreme Court not only reiterated longstanding standards for bad faith claims under Iowa law, but also "adopted standards as articulated by the courts of other jurisdictions as well as commentary on the law of bad faith from secondary sources or treatises, all of which constitute 'new law' in this jurisdiction." Defendant's Brief In Support Of Second Amended And Substituted Motion

For Summary Judgment (docket no. 163-2) at 6. Travelers acknowledges that the court in *Bellville* reiterated the elements of a plaintiff's bad faith claim to be (1) that the insurer had no reasonable basis for denying the plaintiff's claim or for refusing to consent to settlement, *i.e.*, that the insurance claim was not "fairly debatable," an objective element, and (2) that the insurer knew or had reason to know that its denial or refusal was without reasonable basis, a subjective element. However, Travelers contends that the court in *Bellville* then redefined the requirements for the first element.

More specifically, Travelers contends that, formerly, to establish the first element of a bad faith claim, the plaintiff had to prove to the satisfaction of a reasonable fact finder that the insured's decision to deny benefits was not based on an honest and informed judgment. Travelers contends that this standard allowed the court and the jury to weigh the evidence. However, Travelers contends that the *Bellville* decision eliminated any weighing of evidence on this element. Instead, Travelers contends that the court held in *Bellville* that, if the trial court finds that reasonable minds can differ on any coverage-determining fact or law, or if any evidence exists that creates a genuine issue as to the value or compensability of the plaintiff's insurance claim, regardless of whether the insurer's position is ultimately found to lack merit, the trial court *must* hold that the insurance claim was "fairly debatable," and that the plaintiff, consequently, cannot prove the first element of his or her bad faith claim as a matter of law. To put it another way, Travelers argues that, under *Bellville*, unless the court is prepared to grant a directed verdict to the plaintiff on his or her claim under the policy and to hold that reasonable minds could not disagree about the plaintiff's entitlement to policy proceeds, then the insurer is entitled to directed verdict or summary judgment on the plaintiff's bad faith claim. Thus, Travelers contends that, under the new standards, either Niver is entitled to a directed verdict, or Travelers is; there can be no gray area. Because the court found that

genuine issues of material fact on Niver's bad faith claim defeated Travelers's first motion for summary judgment, Travelers contends that the court must now grant Travelers's second motion for summary judgment under the standards stated in *Bellville*, because the court cannot enter a directed verdict for Niver.

In his Joint Brief In Resistance To Defendant's Second Amended And Substituted Motion For Summary Judgment And In Support Of [His] Motion For Summary Judgment, Niver argues that, contrary to Travelers's contentions, there has been no change in Iowa law concerning first-party bad faith claims. Rather, Niver contends that the court in *Bellville* simply applied existing law to the claim before it.

More specifically, Niver contends that Travelers has misstated or misconstrued *Bellville* to suggest that, unless the plaintiff is entitled to a directed verdict *on the bad faith claim*, then the insurer is entitled to summary judgment *on the bad faith claim*, but the court in *Bellville* suggested that what is relevant to the first element of the bad faith claim is whether or not directed verdict is appropriate *on the claim for benefits under the policy*. Even then, Niver points out that the Iowa Supreme Court has previously examined and rejected an automatic "directed verdict" rule and that the court did not resurrect it in *Bellville*, because the decision in *Bellville* cited with approval the prior decision rejecting an automatic "directed verdict" rule. Consequently, Niver contends that, even under *Bellville*, a jury question in a bad faith case does not mean that the insurer is automatically entitled to summary judgment on a bad faith claim. Niver also contends that he is not required to prove that he is entitled to summary judgment on his bad faith claim to defeat Travelers's motion for summary judgment on that claim, only that a reasonable jury could find that Travelers acted in bad faith. On the other hand, he contends that, for Travelers to win on its motion for summary judgment, Travelers must prove that no reasonable juror could find that Travelers acted in bad faith, but proving that Travelers might win is not

enough to obtain summary judgment. Thus, Niver asserts that the mere existence of a factual basis for debating the policy claim is not enough, because a jury could still conclude that the denial was not "reasonable." Niver also contends that the "directed verdict" rule that Travelers asserts is impractical, at least in the context of workers compensation claims, because the policy claim is subject to administrative procedures, instead of joined with the bad faith claim in a single judicial action.

In reply in further support of its own motion for summary judgment and in resistance to Niver's motion for summary judgment, *see* docket no. 168, Travelers repeats much of the argument in its original brief in support of its motion for summary judgment.[3] However, Travelers clarifies its position to be that the issue for the first element of a bad faith claim, after *Bellville*, is only whether evidence existed to justify the insurer's evaluation of the plaintiff's insurance claim. Where such evidence existed, Travelers contends that the plaintiff cannot prove the first element of a bad faith claim, and the insurer is, consequently, entitled to summary judgment on the bad faith claim. Travelers also contends that the nature of the underlying insurance policy—whether for workers compensation or underinsured motorist coverage—is irrelevant to the requirements for proof of a bad faith claim. Instead, Travelers contends that application of the new standards in *Bellville* furthers the long-held belief that first-party bad faith claims should be the exception, not the rule.

Travelers argues In its Supplemental Authority In Support Of Defendant's Second Amended And Substituted Motion For Summary Judgment (docket no. 173), and reiterated at oral arguments, that, in a post-*Bellville* decision, *Calvert v. American Family Ins.*

---

[3]Travelers explains that this repetition is necessary to correct omissions in the original brief, because Travelers inadvertently filed a draft of the original brief rather than the final version it had intended to file.

*Group*, 2006 WL 126635 (Iowa Ct. App. Jan. 19, 2006) (final publication decision pending), the Iowa Court of Appeals relied upon the same language in *Bellville* that Travelers has relied upon as formulating new standards for determining whether a claim is "fairly debatable." Indeed, at oral arguments, counsel for Travelers argued that the *Calvert* decision demonstrates that every subsequent decision will formulate the applicable standards in the terms used in *Bellville*, sweeping away the standards articulated in prior decisions.

### 2. *The Bellville decision*

In *Bellville v. Farm Bureau Mutual Insurance Company*, 702 N.W.2d 468 (Iowa 2005), the decision that Travelers asserts changed Iowa law for bad faith claims, the Iowa Supreme Court addressed the bad faith claim of a motorcycle driver against his underinsured motorist insurer arising from an accident in which the motorcycle driver was uninjured, but his wife, who was a passenger, was killed. The plaintiff's bad faith claim was based on two grounds: (1) the insurer's undervaluation of the plaintiffs' underinsured motorist claim; and (2) the insurer's refusal to consent to the plaintiff's settlement with the underinsured motorist. *Bellville*, 702 N.W.2d at 472.

The trial court had rejected the insurer's motion for directed verdict and the jury had returned a verdict for the plaintiff on both grounds. *Id.* On appeal, the Iowa Court of Appeals "reversed and remanded, finding the evidence was insufficient to prove [the insurer] lacked a reasonable basis for its valuation of [the plaintiff's] claim or for refusing to consent to the settlement" and, consequently, that the trial court had erred in failing to grant the insurer's motion for directed verdict. *Id.*; *see also Bellville v. Farm Bureau Mut. Ins. Co.*, 680 N.W.2d 378, 2004 WL 356056 (Iowa Ct. App. 2004) (table op.) (subsequently vacated). On further review, the Iowa Supreme Court "reach[ed] the same conclusion as the court of appeals, but for slightly different reasons," vacated the decision

of the court of appeals, reversed the district court's judgment, and remanded for entry of judgment in favor of the insurer. *Id.*

### 3.    *The import of Bellville*

To determine whether the *Bellville* decision changed Iowa law concerning the first element of a bad faith claim, this court will consider the Iowa Supreme Court's articulation of the applicable standards and the basis on which the Iowa Supreme Court reached the same conclusion as the Iowa Court of Appeals, "but for slightly different reasons." *Id.* If there has been a "change" in the law in the *Bellville* decision, the court will also consider the scope of that change. The court will then test its determination of the import of *Bellville* by examining a subsequent Iowa appellate decision upon which Travelers relies as showing the effect of *Bellville* on Iowa law.

### a.    *Articulation and application of pertinent standards*

In *Bellville*, the Iowa Supreme Court reiterated the elements of a bad faith claim as follows:

> To establish [the insurer's] bad faith, the plaintiff was required to prove (1) [the insurer] had no reasonable basis for denying the plaintiff's claim or for refusing to consent to settlement, and (2) the [insurer] knew or had reason to know that its denial or refusal was without reasonable basis. *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 149 (Iowa 1998). The first element is an objective one; the second element is subjective. *Reuter [v. State Farm Mut. Auto. Ins. Co.]*, 469 N.W.2d [250,] 253 [(Iowa 1991)].

*Bellville*, 702 N.W.2d at 473. As to the first, objective element, the one on which Travelers contends that the *Bellville* decision changed the law, the court first reiterated longstanding principles that "[a] reasonable basis exists for denial of policy benefits if the insured's claim is fairly debatable either on a matter of fact or law"; that "[a] claim is

19

'fairly debatable' when it is open to dispute on any logical basis"; and that the fact that the insurer's position is ultimately found to lack merit is not enough to prove bad faith, because "[t]he focus is on the existence of a debatable issue, not on which party was correct." *Id.*

The part of the Iowa Supreme Court's decision on which Travelers relies as adopting a change in the law, however, concerns determining whether the underlying insurance claim was "fairly debatable" as a matter of law. That portion of the decision, in its entirety, is the following:

> Whether a claim is fairly debatable can generally be decided as a matter of law by the court. *See Thompson [v. U.S. Fid. & Guar. Co.]*, 559 N.W.2d [288,] 290 [(Iowa 1997)]; *Clark-Peterson Co. v. Indep. Ins. Assocs., Ltd.*, 514 N.W.2d 912, 914 (Iowa 1994); *Wetherbee v. Econ. Fire & Cas. Co.*, 508 N.W.2d 657, 662 (Iowa 1993). That is because "'[w]here an objectively reasonable basis for denial of a claim *actually exists*, the insurer cannot be held liable for bad faith as a matter of law.'" *Gardner v. Hartford Ins. Accident & Indem. Co.*, 659 N.W.2d 198, 206 (Iowa 2003) (quoting *Morgan [v. Am. Family Mut. Ins. Co.]*, 534 N.W.2d [92,] 97 [(Iowa 1995), *overruled on other grounds by Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 784 (Iowa 2000)] (emphasis added). As one court has explained, "[c]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to justify denial of the claim." *[State Farm Lloyds, Inc. v.] Polasek*, 847 S.W.2d [279,] 285 [(Tex. App. 1992)]. Thus, if it is undisputed that evidence existed creating a genuine dispute as to the negligence of an uninsured or underinsured motorist, the comparative fault of the insured, the nature and extent of the insured's injuries, or the value of the insured's damages, a court can almost always decide that the claim was fairly debatable as a matter of law. *See, e.g., Sampson*, 582 N.W.2d at 152 (holding district court properly decided bad

faith claim as a matter of law where nature and extent of insured's injuries were debatable); *Cent. Life Ins. Co. [v. Aetna Cas. & Sur. Co.]*, 466 N.W.2d [257,] 263 [(Iowa 1991)] (holding insurer entitled to judgment as a matter of law where there was a good faith dispute on the amount of the insured's damages); *Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 862 (Iowa 1991) (holding insurer entitled to directed verdict on bad faith claim where there was conflicting information as to who was at fault in underlying automobile accident); [William T.] Barker & [Paul E.B.] Glad, *[Use of Summary Judgment in Defense of Bad Faith Actions Involving First-Party Insurance]*, 30 Tort & Ins. L.J. [49,] 57 [(1994)] (same). One treatise has explained the standard this way:

> [A]n insurer is innocent of bad faith as a matter of law . . . if the insurer took a position in regard to the claim that reasonable minds could hold. Unless the trial court is prepared to grant a directed verdict to the insured on his claim under the policy and to hold that reasonable minds could not disagree as to the insured's entitlement to proceeds under the policy, it follows that reasonable minds could disagree about the insured's entitlement to policy proceeds. Therefore, the insurer should be entitled to a directed verdict in its favor on the insured's bad faith claim unless the insured is entitled to a directed verdict in his favor on the policy claim.

Stephen S. Ashley, *Bad Faith Actions Liability & Damages* § 5:04, at 5- 17 to 5-18 (2d ed.1997) (also discussing exceptions to this rule, none of which are implicated here) [hereinafter "*Bad Faith Actions*"]; *accord Reuter*, 469 N.W.2d at 254 (noting that existence of submissible jury question on insured's entitlement to policy benefits will generally, though not automatically, establish that the issue is fairly debatable); *see also Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 108 Cal. Rptr. 2d 776, 785, 787 (2001) (stating "as long as *there is no dispute as to the underlying facts*, it is for the court, not a jury, to decide

> whether the insurer had 'proper cause' [to deny the insured's claim]").

*Bellville*, 702 N.W.2d at 473-74 (emphasis in the original). Contrary to Travelers's contentions, the court finds that there are at least two reasons why the portion of the *Bellville* decision quoted above did not change Iowa law for bad faith claims, at least not in a way that is significant here. The court will explain these reasons below.

      ***i.***    ***Reliance on prior or new authority***. First, this court finds that the Iowa Supreme Court's reiteration of and reliance on prior precedent in *Bellville* demonstrates that Travelers's contention that the *Bellville* decision states "new" standards for the first element of bad faith claims that are relevant here is without merit. In the *Bellville* decision, there is no signal—indeed, there is not the merest hint—that the Iowa Supreme Court intended to modify Iowa law or to reject its prior formulations of the requirements for the first element of a bad faith claim. The decision does not expressly reject or distinguish any statement of the applicable standards in any prior case; instead, the formulation of the applicable standard in *Bellville* relies primarily on prior Iowa decisions. *See id.* (beginning its explanation of when the court can decide as a matter of law that the insurance claim was"fairly debatable" by citing *Thompson*, 559 N.W.2d at 290; *Clark-Peterson Co.*, 514 N.W.2d at 914; *Weatherbee*, 508 N.W.2d at 662; and *Gardner*, 659 N.W.2d at 206). Treatises and decisions from outside of the jurisdiction are used only to illustrate principles first articulated by reference to Iowa decisions. *See id.* at 474 (citing *Polasek*, 847 S.W.2d at 285; Barker & Glad, *Use of Summary Judgment*, 30 TORT & INS. L.J. at 57; Ashley, *Bad Faith Actions* § 5:04, at 5-17 to 5-18; and *Chateau Chamberay Homeowners Ass'n*, 90 Cal. App. 4th 335, 108 Cal. Rptr. 2d at 785 & 787). Moreover, each treatise or out-of-state decision is then shown to be in accord with Iowa

decisions. *Id.* (interpolating citations to *Sampson*, 582 N.W.2d at 152; *Cent. Life Ins. Co.*, 466 N.W.2d at 263; *Dirks*, 465 N.W.2d at 862; and *Reuter*, 469 N.W.2d at 254).

More specifically, the *Bellville* court's citation of the *Reuter* decision with approval undermines Travelers's contention that the *Bellville* decision adopted a new "directed verdict" rule. In *Bellville*, after the quotation to the Ashley treatise, which Travelers contends clearly adopts the "directed verdict" rule, the Iowa Supreme Court noted that the Ashley treatise recognizes exceptions to such a rule, then cited its own decision in *Reuter* as in accord, because, as characterized by the Iowa Supreme Court in *Bellville*, the *Reuter* decision held that the existence of a submissible jury question on the insured's entitlement to policy benefits will generally, though not automatically, establish that the issue is fairly debatable. *Bellville*, 702 N.W.2d at 474 (citing *Reuter*, 469 N.W.2d at 254). In *Reuter* itself, the Iowa Supreme Court concluded that the trial court had erred when it held that submission of the underlying issue of breach of contract to a jury would, "in and of itself," establish that the issue of proper denial of the insurance claim was debatable. *Reuter*, 469 N.W.2d at 254. More specifically, the court in *Reuters* explained,

> We do not agree that the mere denial of a plaintiff's motion for directed verdict [on the policy claim] automatically establishes that the issue is "fairly debatable." The trial court should carefully review the facts and the particular circumstances in making its determination as to what is the precise issue or issues that are debatable.

*Reuter*, 469 N.W.2d at 254. A reading of the *Bellville* decision as adopting a "directed verdict" rule that the Iowa Supreme Court had previously rejected in *Reuter* is ultimately unconvincing, when the *Bellville* decision cites *Reuter* with approval in the context of discussing the effect of a directed verdict.

Thus, the Iowa Supreme Court's continued reliance in *Bellville* on its prior formulations of the applicable standards for the first element of a bad faith claim, including a decision rejecting the very rule that Travelers contends that the *Bellville* decision adopted, shows that the Iowa Supreme Court did not adopt, and did not intend to adopt, new standards.

  ***ii. Comparison to the opinion of the Iowa Court of Appeals***.  The court also rejects Travelers's contention that the Iowa Supreme Court implied that it intended to change the law for bad faith claims simply by taking the *Bellville* case for further review, even though it reached the same conclusion as the Iowa Court of Appeals.  The court is reluctant to speculate about the motives of the highest court in a particular jurisdiction in taking a case for further review.  Moreover, as noted above, in its own decision in *Bellville*, the Iowa Supreme Court neither expressly stated an intent to modify the standards for the first element of bad faith claims nor hinted that the Iowa Court of Appeals had misstated the applicable law in a way that is significant here.  Nevertheless, this court will consider whether there are hints in the two appellate decisions as to what led the Iowa Supreme Court to "reach the same conclusion as the court of appeals, but for slightly different reasons," *see Bellville*, 702 N.W.2d at 472, and to see if the "slightly different reasons" indicate an intention to change Iowa law applicable to the first element of bad faith claims in a way that is significant in this case.

  In its decision in *Bellville*, the Iowa Court of Appeals concluded that the valuation of the plaintiff's insurance claim was fairly debatable, and that the insurer, consequently, had an objectively reasonable basis for offering the plaintiff a lesser sum than he demanded.  The Iowa Court of Appeals relied on evidence of the insurer's valuation of the wife's estate based on the insurer's claims history involving similarly situated claimants and the insurer's awareness of significant evidence that the plaintiff had caused the accident

by running a traffic light, or at least that the plaintiff had known that the traffic light was yellow when he entered the intersection where the accident occurred. *See Bellville*, 680 N.W.2d at 378, 2004 WL 356056 at *3. The Iowa Supreme Court made a much more extensive examination of the evidence concerning the value of the plaintiff's insurance claim, but did not reject outright the intermediate court's statement of applicable standards. *See Bellville*, 702 N.W.2d at 475-82.

Specifically, the Iowa Supreme Court concluded that experts' disagreement with the insurer's valuation of the plaintiff's claim is insufficient to establish bad faith, because the plaintiff must present evidence that the basis for the insurer's valuation was unreasonable. *Id*. at 475. However, this conclusion did not change the law, because the Iowa Court of Appeals had not held that such a disagreement *was* sufficient. The Iowa Supreme Court then agreed with the Iowa Court of Appeals that there was evidence of the plaintiff's fault on which the insurer had reasonably relied, but articulated more specifically what that evidence was. First, the Iowa Supreme Court concluded that the insurer could properly rely on a police officer's report of his investigation, even if the investigating officer's report possibly was inadmissible in the trial of the personal injury case, and even if different conclusions could be drawn from the facts revealed by the officer's investigation. *Id*. at 477-78. The court also rejected any duty on the part of the insurer to investigate further, *id*. at 478, and found that the plaintiff had failed to demonstrate at trial that the investigating officer's report was patently wrong. *Id*. at 478. The court explained, further, that "the mere existence of evidence supporting the fault evaluation asserted by [the plaintiff] does not establish bad faith." *Id*. at 479. Consequently, the court concluded as a matter of law that the extent of the plaintiff's fault was fairly debatable. *Id*. Thus, the Iowa Supreme Court considered more specifically than the Iowa Court of Appeals had the evidence upon which the insurer relied and the failure of the plaintiff to generate

sufficient evidence to show that the insurer's reliance on the plaintiff's comparative fault was unreasonable. *Id.* at 475-77. However, nowhere in the course of that analysis did the Iowa Supreme Court refer to a "directed verdict" standard or intimate that, because the plaintiff was not entitled to a directed verdict on his policy claim, his bad faith claim failed as a matter of law.

As to the second part of the valuation issue, the Iowa Supreme Court also made a more extensive examination of the basis for the insurer's rejection of the plaintiff's claimed damages, including the valuation of his wife's estate, but by considering loss of earnings, loss of support, and loss of consortium. *Id.* Where the Iowa Court of Appeals had relied on valuation of the wife's estate based on the insurer's claims history involving similarly situated claimants, *see Bellville*, 680 N.W.2d at 378, 2004 WL 356056 at *3, the Iowa Supreme Court concluded that "[t]he measure of liability under the [underinsured motorist] coverage is the tortfeasor's 'legal liability' to the insured . . . measured by what a jury would award; it is not measured by the amount for which such a case could be settled." *Bellville*, 702 N.W.2d at 480. This refocusing of the pertinent question, however, does not invoke the "directed verdict" rule that Travelers asserts here. The Iowa Supreme Court also found in *Bellville* that settlements and jury verdicts in other cases were only relevant to the extent that they involved comparable factors involved in valuation of the claims, and even then, comparisons might be of little predictive value. *Id.* The court also held that evidence that a reasonable insurer would have paid the plaintiff's settlement demand also was insufficient to support a finding of bad faith, while discrepancies among expert opinions on valuation merely showed that it was difficult to determine how a jury would value the underlying insurance claim. *Id.* 481-82. Ultimately, the court concluded that, "[g]iven the amounts involved in the case . . . , [the court was] convinced the value of the plaintiff's claim was clearly subject to debate." *Id.* 482. Thus, even though the

Iowa Supreme Court refocused the question and took issue with some of the evidence relied upon by the Iowa Court of Appeals in finding that the valuation of the underlying insurance claim was fairly debatable, nowhere in its discussion of the valuation issue did the Iowa Supreme Court suggest that the Iowa Court of Appeals had erred in failing to apply a "directed verdict" standard or articulate the correct standard as a "directed verdict" standard.

As to the issue of whether the insurer had a reasonable basis to refuse to consent to a settlement favored by the plaintiff, the second allegation of bad faith in *Bellville*, the Iowa Court of Appeals concluded that the plaintiff had presented no evidence that the insurer's refusal to consent to the settlement injured or impeded the plaintiff's right to receive benefits under the parties' agreement; concluded that there was no statutory duty on the insurer to consent to settlement, although it found an implied duty of good faith to consent to settlement inherent in the insurance contract; and concluded that the insurer reasonably believed that the proposed settlement would adversely affect its right to subrogation from the third-party tortfeasor. *Bellville*, 680 N.W.2d at 389, 2004 WL 356056 at *4. On the "ultimate question," therefore, the Iowa Court of Appeals concluded that the plaintiff failed to present substantial evidence establishing that the insurer did not have a reasonable basis for failing to consent to the proposed settlement during the relevant time period. *Id.*, 2004 WL 356056 at *5.

The Iowa Supreme Court likewise held that an insurer has a good faith duty to consent to settlement unless it has a reasonable basis for refusing to do so. *Bellville*, 702 N.W.2d at 484. The court then held that "[t]here are several factors that indicate [the insurer] had a reasonable basis to assert it had no duty to consent to the insured's settlement," including the fact that "whether a UIM [underinsured motorist] insurer has a good faith duty to consent had not been decided by an Iowa appellate court" and the fact

that reasonable minds could differ on whether such a duty should be implied. *Id.* Although the court recognized such an implied good faith duty to consent to settlement—which clearly was "new" law—the court held that the duty was not so evident that the insurer in the case before it could not fairly debate whether such a duty existed. *Id.* at 485. Again, there is no indication in this part of the Iowa Supreme Court's opinion that the basis for vacating the opinion of the Iowa Court of Appeals was that the Iowa Court of Appeals applied an incorrect legal standard to the first element of a bad faith claim, *i.e.*, whether the underlying insurance claim was "fairly debatable," or that the Iowa Court of Appeals should have applied a "directed verdict" standard, or that it was the intention of the Iowa Supreme Court to establish a "directed verdict" standard for the objective element. Instead, to the extent that the Iowa Supreme Court's decision in *Bellville* expressly states "new" law, it was to confirm the recognition by the Iowa Court of Appeals of an insurer's good faith duty to consent to settlement, which is not at issue here.

Thus, while the Iowa Supreme Court sometimes explained that it took a different view of the evidence presented, and did confirm the recognition by the Iowa Court of Appeals of "new" law concerning an insurer's good faith duty to consent to settlement, it is clear from a comparison of the two appellate decisions that the "slightly different reasons" on which the Iowa Supreme Court reached the same result as the Iowa Court of Appeals in the *Bellville* case, *see Bellville*, 702 N.W.2d at 472, had nothing to do with recognition of a new "directed verdict" standard for the first element of a bad faith claim.

Consequently, the court finds that the *Bellville* decision did not establish "new" law concerning a bad faith claim that is relevant to any issue in this case.

### b.    *The scope of any modification of the applicable standards*

Moreover, even assuming for the sake of argument that the Iowa Supreme Court modified the standards for the first element of a bad faith claim in its decision in *Bellville*, the modification did not go so far as Travelers contends.  The court finds that Travelers has misconstrued or overstated the import of the *Bellville* decision in at least three respects.

First, while the Iowa Supreme Court's commentary on the first element of a bad faith claim, including its citations to treatises and decisions of other jurisdictions, could be read to suggest that whether or not the plaintiff is entitled to a directed verdict is *relevant* to determination of whether or not the court should decide the first element of a bad faith claim as a matter of law, it is clear that the Iowa Supreme Court did not intend that determination of whether the plaintiff is entitled to a directed verdict would "automatically" be *dispositive* of the outcome of the bad faith claim.  Rather, the rule as stated in the Iowa Supreme Court's quotation of the Ashley treatise is that "'the insurer *should* be entitled to a directed verdict in its favor on the insured's bad faith claim unless the insured is entitled to a directed verdict in his favor on the policy claim.'"  *Bellville*, 702 N.W.2d at 474 (quoting Stephen S. Ashley, Bad Faith Actions Liability & Damages § 5:04, at 5-17 to 5-18 (2d ed. 1997)) (emphasis added by this court).  Thus, the purported "rule" as quoted from the Ashley treatise is *not* that the court *must* grant a directed verdict to the insurer unless the plaintiff is entitled to a directed verdict on the policy claim, as Travelers has formulated the rule.  Moreover, the subsequent citation to the *Reuter* decision makes clear that the effect of consideration of the "directed verdict" issue is that it may "generally" determine the outcome, but that it does not do so "automatically."  *See id.* (citing *Reuter*, 469 N.W.2d at 254.  Indeed, in *Reuter*, which the *Bellville* court cited with approval, the Iowa Supreme Court expressly rejected the rule that "mere denial of a plaintiff's motion for a directed verdict automatically establishes that the

issue is 'fairly debatable.'" *Reuter*, 469 N.W.2d at 254. Thus, even after *Bellville*, "[t]he trial court should carefully review the facts and the particular circumstances in making its determination as to what is the precise issue or issues that are debatable." *Id.*

Second, at least some of Travelers's arguments suggest that Travelers is trying to apply the purported "directed verdict" rule to the wrong action. The question of the effect of a directed verdict under *Bellville* concerns the plaintiff's entitlement to a directed verdict *on the underlying policy claim*, not on the bad faith claim. *See Bellville*, 702 N.W.2d at 474 ("'Unless the trial court is prepared to grant a directed verdict to the insured *on his claim under the policy* and to hold that reasonable minds could not disagree as to the insured's entitlement to proceeds under the policy, it follows that reasonable minds could disagree about the insured's entitlement to policy proceeds.'") (quoting ASHLEY, BAD FAITH ACTIONS, § 5:04, at 5-17 to 5-18) (emphasis added by this court). Thus, Travelers is simply wrong when it argues that, under the *Bellville* standard, either Niver is entitled to directed verdict *on the bad faith claim*, or Travelers is, because there can be no gray area. Similarly, Travelers is simply wrong when it argues that, because the court found that genuine issues of material fact on Niver's bad faith claim defeated Travelers's first motion for summary judgment, the court must now grant Travelers's second motion for summary judgment, because the court cannot enter a directed verdict for Niver. This court did not entertain the policy claim and the bad faith claim simultaneously; indeed, the policy claim is simply not before this court. Rather, while the question of whether this court *would have* granted a directed verdict for Niver on his policy claim, had that claim been before the court, may have some relevance to the question of whether Niver can prove the first element of his bad faith claim, even then, this court "should carefully review the facts and the particular circumstances in making its determination as to what is the precise issue or issues that are [or were] debatable" on the policy claim. *Reuter*, 469 N.W.2d at 254.

Finally, Travelers seems to suggest that merely pointing to the "existence" of evidence that Niver's October 2000 groin problems were caused by something other than his surgery for the 1995 hernia is sufficient to establish that his October 2000 claim was "fairly debatable." Again, this is a misreading of the Iowa Supreme Court's decision in *Bellville*. The *Bellville* decision never states nor suggests that the mere existence of contrary evidence concerning the compensability or value of an insured's claim is sufficient to make the claim "fairly debatable." Instead, what that decision says repeatedly is that the evidence upon which the denial is based must be sufficient to provide "an objectively reasonable basis for denial," *see Bellville*, 702 N.W.2d at 473 ("Whether a claim is fairly debatable can generally be decided as a matter of law by the court . . . because where *an objectively reasonable basis* for denial of a claim *actually exists*, the insurer cannot be held liable for bad faith as a matter of law.") (internal citations and quotation marks omitted) (first emphasis added, second emphasis in the original), must be sufficient to "justify" the denial, *see id.* at 474 ("As one court has explained, courts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to *justify denial of the claim*.") (internal citations and quotation marks omitted, first emphasis in the original, second emphasis added), and must "creat[e] a genuine dispute as to" the compensability of the claim. *See id.* ("[I]f it is undisputed that evidence existed *creating a genuine dispute as to the [compensability or value of the claim]*, a court can almost always decide that the claim was fairly debatable as a matter of law.") (emphasis added). Thus, the court (or the jury) is required to determine whether the evidence that "exists" is sufficient for a reasonable person to find that the claim was "fairly debatable." Although Travelers is correct that the court (or jury) does not weigh the evidence, that has never been the role of the court or the jury on the "objective" element of a bad faith claim, in the sense of determining whether or not the insurer was right. *See id.* at 473 ("The

focus is on the existence of a debatable issue, not on which party was correct.") (citing *Thompson*, 559 N.W.2d at 292); *see also id.* at 474 ("As one court has explained, courts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to *justify denial of the claim.*") (internal citations and quotation marks omitted, first emphasis in the original, second emphasis added). Even under *Bellville*, however, the court (or jury) must determine whether the evidence upon which the insurer relied was sufficient to provide an "objectively reasonable basis for denial of a claim," not merely whether some scintilla of evidence "existed" to support the insurer's denial. *Id.*; *and compare Quick*, 90 F.3d at 1376-77 (applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial); *Johnson*, 906 F.2d at 1237 (same).

Therefore, even if the *Bellville* decision did change the law concerning the first element of a bad faith claim, the change did not go so far as Travelers contends. At most, the "new" rule in *Bellville* is that the insurer *should generally be* entitled to a directed verdict in its favor on the insured's bad faith claim, unless the insured is entitled to a directed verdict in his favor on the policy claim, but the existence of a submissible jury question on the insured's entitlement to policy benefits *does not automatically* establish that the insurer is entitled to judgment as a matter of law on the insured's bad faith claim. *See Bellville*, 702 N.W.2d at 474.

### c.     *Subsequent application of Bellville by the Iowa Court of Appeals*

Travelers argues that a post-*Bellville* decision of the Iowa Court of Appeals, *Calvert v. American Family Ins. Group*, 2006 WL 126635 (Iowa Ct. App. Jan. 19, 2006) (final publication decision pending), demonstrates that the change in the law adopted in *Bellville*

is beginning to "reverberate." This court does not believe that the *Calvert* decision demonstrates any such thing.

In the pertinent part of the *Calvert* decision, the Iowa Court of Appeals first stated the elements of a bad faith claim in precisely the same way as the Iowa Supreme Court had in *Bellville*, but citing the prior authorities on which *Bellville* relied, instead of citing *Bellville* itself. *See Calvert*, 2006 WL 126635 at *3 (citing *Sampson*, 582 N.W.2d at 149 and *Reuter*, 469 N.W.2d at 251); *and compare Bellville*, 702 N.W.2d at 473 (stating the same elements based on the same authorities). Travelers is correct, however, that, in *Calvert*, the Iowa Court of Appeals then drew upon the Iowa Supreme Court's formulation in *Bellville* of the standards for determination of the first element of a bad faith claim, as follows:

> Our supreme court has recently summarized the court's role in assessing the existence of an objectively reasonable basis:
>
>> A reasonable basis exists for denial of policy benefits if the insured's claim is fairly debatable either on a matter of fact or law. A claim is "fairly debatable" when it is open to dispute on any logical basis. Stated another way, if reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable.
>>
>> ....
>> Whether a claim is fairly debatable can generally be decided as a matter of law by the court. That is because " '[w]here an objectively reasonable basis for denial of a claim actually exists, the insurer cannot be held liable for bad faith as a matter of law.' " As one court has explained, "[c]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide whether evidence existed to justify denial of the claim." Thus, if it is undisputed that evidence

> existed creating a genuine dispute as to … the nature
> and extent of the insured's injuries, … a court can
> almost always decide that the claim was fairly debatable
> as a matter of law.
>
> *Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468,
> 473-74 (Iowa 2005) (citations omitted).

*Calvert*, 2006 WL 126635 at *3. The Iowa Court of Appeals then concluded that, "[a]pplying these principles, we agree that, under the undisputed facts in this case, American Family had an objectively reasonable basis for delaying payment of Calvert's dental-related medical expenses." *Id.*

Prominent by its omission in *Calvert* is any reference to *Bellville* as either stating "new law," "changing" the law, or adopting a "directed verdict" rule. Surely if *Bellville* worked the fundamental sea change in the law that Travelers asserts that it did, that fact would be unlikely to pass without comment by the Iowa Court of Appeals. Moreover, although citations are omitted from the quoted portion of the *Bellville* decision, and that portion of the decision does include a quotation from one out-of-state decision, *Polasek*, 847 S.W.2d at 285, as this court noted above in its own analysis of the *Bellville* decision, this portion of the *Bellville* decision otherwise relies entirely on *prior Iowa decisions* for the formulation of the applicable standards. *Compare Bellville*, 702 F.3d at 473-74 (citing, in the following order, *Thompson*, 559 N.W.2d at 290; *Clark-Peterson Co.*, 514 N.W.2d at 914; *Wetherbee*, 508 N.W.2d at 662; *Gardner*, 659 N.W.2d at 206; and *Sampson*, 582 N.W.2d at 152). While it was quite natural for an intermediate court to rely upon the highest court's most recent articulation of applicable standards, it is unrealistic to assert that *Bellville* is the only Iowa decision with any authority on the formulation of the standards applicable to the first element of a bad faith claim, sweeping away all prior Iowa

authority, simply because the Iowa Court of Appeals subsequently quoted a chunk of the *Bellville* decision with its underlying citations to prior Iowa decisions omitted.

Still more damaging to Travelers's argument that *Calvert* recognizes a "change in the law" in *Bellville* is the fact that the standard from *Bellville* that the Iowa Court of Appeals stated that it was applying in *Calvert* was not a "directed verdict" rule, but the pre-existing Iowa standard of whether the insurer "had an objectively reasonable basis for" denying or delaying payment of benefits. *See Calvert*, 2006 WL 126635 at *3 (restating the standard stated in *Bellville*, 702 N.W.2d at 473-74, which in turn quoted the standard from *Gardner*, 659 N.W.2d at 206, which in turn quoted the standard from *Morgan*, 534 N.W.2d at 97). Similarly, the Iowa Court of Appeals applied from *Bellville* the pre-existing definition of "fairly debatable" as "'open to dispute on any logical basis.'" *Id.* at *5 (quoting *Bellville*, 702 N.W.2d at 473, in turn quoting *Morgan*, 534 N.W.2d at 96). Thus, *Calvert* is no demonstration that the prevailing rule in Iowa, post-*Bellville*, is the "directed verdict" rule that Travelers advocates, any more than *Bellville* itself can be read for such a proposition.

In short, the *Calvert* decision ultimately supports the court's conclusion that *Bellville* did not change the law, or if it did, that the change plainly did not go as far as Travelers contends.


### C. Application Of The Standards

Having clarified what standards apply to a bad faith claim under Iowa law after the Iowa Supreme Court's decision in *Bellville*, the court turns next to the question of whether either party is entitled to summary judgment under those standards. The court's analysis of that question begins with a summary of the parties' arguments.

### 1. *Arguments of the parties*

Travelers's argument for summary judgment based on application of the standards post-*Bellville*, as stated in both its briefs and its oral arguments, is in essence that this court has already determined that a number of genuine issues of material fact "exist" regarding Niver's claim for damages as a result of Travelers's alleged bad faith. Because such genuine issues of material fact "exist," Travelers contends that it is necessarily entitled to summary judgment on the bad faith claim, where those genuine issues of material fact prevent the court from granting a directed verdict in Niver's favor under Travelers's reading of *Bellville*. Moreover, Travelers argues that, under the *Bellville* standards, this court is no longer empowered to weigh the conflicting evidence upon which the parties' positions were based. Instead, Travelers contends that the only issue is whether evidence to deny the claim "existed." If the court determines that some evidence existed to justify Travelers's evaluation of Niver's claim, as to either causation or value, Travelers contends that it is irrelevant whether the court believes the evidence that Travelers believed when it denied the claim. Travelers argues that, clearly, the record before this court shows that substantial evidence existed to support Travelers's denial of Niver's claim for workers compensation benefits. Thus, Travelers contends, Niver cannot be entitled to a "directed verdict" on his claim for workers compensation benefits and, hence, cannot win on his bad faith claim.

On the other hand, Niver contends that he is entitled to summary judgment, because Travelers had no reasonable basis to debate his claim for workers compensation benefits for the October 2000 groin problems pursuant to the 1995 hernia claim or that, at the very least, there are genuine issues of material fact as to whether Travelers had any such reasonable basis to debate his workers compensation claim. Niver then identifies the

evidence and legal principles that he contends entitle him to summary judgment or, at the very least, defeat Travelers's motion for summary judgment.

For example, Niver points to Travelers's own claim file notes, which indicate that adjustors recognized that all of the medical evidence related the October 2000 groin problem to the 1995 hernia claim. Niver argues that the fact that his doctors initially considered other possible causes for his October 2000 groin pain did not provide Travelers with a reasonable basis for debating his workers compensation claim, where those other possible causes were eventually (indeed, rather quickly) eliminated after his December 2000 surgery revealed the neuroma and scar tissue from the prior hernia surgery as the cause of his pain and subsequent medical records focused on the prior hernia problem as a source of the October 2000 groin pain. Thus, Niver contends that there was no *objectively reasonable* basis for Travelers to continue to debate his entitlement to workers compensation benefits for the October 2000 groin pain pursuant to the 1995 hernia claim. Niver also points out that, even though Travelers had the right to require further medical examinations by physicians of its choice, Travelers never attempted to obtain its own medical examinations. Moreover, Niver contends that, under Iowa law, he was entitled to workers compensation benefits if the 1995 hernia surgery was *a* proximate cause of the October 2000 groin pain; he was not required to show that the 1995 hernia surgery was the *sole* proximate cause of the later groin pain. Finally, Niver argues that Travelers is not entitled to summary judgment or to defeat his motion for summary judgment on his bad faith claim on the ground that Niver originally pursued workers compensation benefits for the October 2000 groin problem pursuant to three different workers compensation claims. Rather, Niver contends that he reasonably pursued all three claims initially, when the basis for his groin pain was not yet clear, and subsequently, when Travelers seemed intent on denying the claim on any and all bases.

In its resistance to Niver's motion for summary judgment, Travelers argues that, as found by the Iowa Workers Compensation Commission, medical records, including medical records after Niver's December 2000 surgery, show that treating physicians continued to consider various possible causes for Niver's groin pain, including prostatitis, leukocytosis, and epididymitis, and even possible neuropathy or overuse activity after a long period of deconditioning. Travelers also contends that, as it asserted before the Workers Compensation Commission, the record also shows that there were factual disputes about the extent, nature, and value of Niver's groin injury. While Travelers concedes that the Workers Compensation Commission ultimately found in favor of Niver on his claim for benefits, the fact that Travelers was found to be "wrong" in its evaluation does not mean that it acted in bad faith in either disputing the claim or appealing the administrative decision. Travelers argues that, to defeat Niver's bad faith claim, it is not required to prove that no reasonable juror could find that it acted in bad faith, only that evidence existed supporting its denial of Niver's claim for workers compensation benefits. Next, Travelers contends that Niver's own pursuit of benefits under three different workers compensation claims and his demand for workers compensation benefits, such as weekly and penalty benefits, that plainly were not available if his October 2000 groin pain was related to the 1995 hernia claim, demonstrate that Niver's claim was "fairly debatable." Ultimately, Travelers argues that no reasonable juror could find that it acted in bad faith in debating Niver's claim for workers compensation benefits for groin pain, in light of the medical records showing various possible causes of Niver's groin pain and Niver's own pursuit of workers compensation benefits under three different workers compensation claims. Indeed, Travelers argues that it was Niver's pursuit of benefits under three different claims that made his claim for benefits "fairly debatable," even after Travelers adjustors came to believe that the October 2000 claim should have been paid under the

1995 hernia claim. Thus, Travelers contends that the claim was "fairly debatable" and it neither knew nor should have known that the claim should be paid.

In his reply in support of his own motion for summary judgment, Niver argues that Travelers has now admitted that it should have paid, and knew it should have paid, his claim pursuant to the 1995 hernia claim long before it was compelled to do so by the Workers Compensation Commission. Thus, he argues that the only remaining question is whether continued denial of his claim was nevertheless "reasonable." He argues that his pursuit of benefits under three different workers compensation claims did not create a fair debate about his entitlement to benefits under the 1995 hernia claim, because he was forced into that position by Travelers's unreasonable denial of his claim, and his pursuit of various claims did not prevent Travelers from paying the claim under the 1995 hernia claim when it was apparent that Travelers had no reasonable basis to debate payment under that claim. Niver argues that Iowa courts have rejected the contention that a claimant's pursuit of multiple workers compensation claims negates an insurer's duty to act reasonably in investigating, evaluating, reevaluating, and ultimately paying a claim. Niver also points out that he eventually dismissed all of his claims for benefits except for the claim pursuant to the 1995 hernia claim, which certainly left Travelers with no further basis to debate the claim.

### 2. *Analysis*

As mentioned above, in *Bellville*, the Iowa Supreme Court reiterated the elements of a bad faith claim as follows:

> To establish [the insurer's] bad faith, the plaintiff was required to prove (1) [the insurer] had no reasonable basis for denying the plaintiff's claim or for refusing to consent to settlement, and (2) the [insurer] knew or had reason to know that its denial or refusal was without reasonable basis.

> *Sampson v. Am. Standard Ins. Co.*, 582 N.W.2d 146, 149
> (Iowa 1998). The first element is an objective one; the second
> element is subjective. *Reuter [v. State Farm Mut. Auto. Ins.
> Co.]*, 469 N.W.2d [250,] 253 [(Iowa 1991)].

*Bellville*, 702 N.W.2d at 473. The court will consider whether either party is entitled to summary judgment on either of these elements.

### a.    The objective element

Several of Travelers's arguments that it is entitled to summary judgment on the first element of Niver's bad faith claim—that Travelers had no reasonable basis for denying Niver's claim for workers compensation benefits for the October 2000 groin problems, *i.e.*, that the claim was not "fairly debatable," *id.*—are based on what the court determined above were misreadings of the *Bellville* decision. First, as explained above, the court's conclusion that there are genuine issues of material fact defeating a motion for summary judgment or directed verdict on Niver's *bad faith* claim does not mean, as Travelers suggests, that Travelers is necessarily entitled to summary judgment on that claim. Rather, what is or may be relevant to the first element of a *bad faith* claim is whether a directed verdict could be granted on Niver's *benefits* claim. *See id.* at 474 ("'Unless the trial court is prepared to grant a directed verdict to the insured *on his claim under the policy* and to hold that reasonable minds could not disagree as to the insured's entitlement to proceeds under the policy, it follows that reasonable minds could disagree about the insured's entitlement to policy proceeds.'") (quoting ASHLEY, BAD FAITH ACTIONS, § 5:04, at 5-17 to 5-18) (emphasis added by this court). Second, as also explained above, *Bellville* does not stand for the proposition that the existence of any quantum of evidence, however minute, that supports denial of a claim is sufficient to make that claim "fairly debatable," as Travelers contends. Rather, *Bellville* stands for the proposition that the evidence upon which the denial is based must be sufficient to provide "an objectively reasonable basis for

denial of a claim." *Id.* at 473 ("Whether a claim is fairly debatable can generally be decided as a matter of law by the court . . . because where *an objectively reasonable basis* for denial of a claim *actually exists*, the insurer cannot be held liable for bad faith as a matter of law.") (internal citations and quotation marks omitted) (first emphasis added, second emphasis in the original).

Also unpersuasive as a matter of law is Travelers's contention that Niver's claim for workers compensation benefits was "fairly debatable" simply because Niver initially asserted that he was entitled to benefits under one or more of three different workers compensation claims—the 1995 hernia claim, the 1999 knee claim, or a claim for a new injury in October 2000. The onus is not on the injured worker to guess right about the basis on which his workers compensation claim might be paid; rather, the onus is on the workers compensation insurer to "act reasonably in regard to benefit payments [even] in the absence of specific direction by the commissioner." *Boylan v. American Motorists Ins. Co.*, 489 N.W.2d 742, 743 (Iowa 1992); *see also Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 397 (Iowa 2001) (finding such duty to act reasonably with regard to payment of benefits in IOWA CODE § 86.13, and citing *Boylan*); *Davidson v. Bruce*, 594 N.W.2d 833, 838 (Iowa Ct. App. 1999) (same). Just as a determination that an insurer's denial of benefits was "wrong" does not necessarily establish that the denial was in bad faith, it seems equally clear that an injured worker's assertion of several bases for a claim for benefits, some of which are ultimately shown to be "wrong," does not necessarily establish that the claim for benefits was "fairly debatable." *See Bellville*, 702 N.W.2d at 473 ("The focus is on the existence of a debatable issue, not on which party was correct."). Indeed, in an unpublished decision, on which Niver relies, the Iowa Court of Appeals held that an injured worker's initial pleading of several potential injury dates did not make the workers compensation insurer's reliance on only one of those dates "fairly debatable," where "the

evidence generated after the pleading stage conclusively established the injury was not manifest until" a later date, invoking a higher weekly benefit. *See United Techs. Corp. v. Bahmler*, 662 N.W.2d 373, 2003 WL 553855, *4 (Iowa Ct. App. 2003) (table op.). Thus, the question is whether there was *a point at which* Travelers no longer had a reasonable basis to deny Niver's claim for benefits pursuant to *any* of Niver's workers compensation claims. *See id.*; *see also McIlravy v. North River Ins. Co.*, 653 N.W.2d 323, 331 (Iowa 2002) (holding that, where an initial denial may have been justified, but subsequent evidence revealed a basis for paying the claim, "the inquiry must focus on the [insurer's] initial denial as well as 'whether, at some later date, [the insurer] became aware there was no reasonable basis to continue denying [the worker's] claim.'") (quoting *Dirks v. Farm Bureau Mut. Ins. Co.*, 465 N.W.2d 857, 862 (Iowa 1991), and also citing *Squealer Feeds v. Pickering*, 530 N.W.2d 678, 683 (Iowa 1995)).

The court finds the *McIlravy* decision particularly instructive here. In *McIlravy*, the Iowa Supreme Court concluded that "information gathered from the initial interview of [the injured worker] gave [the insurer] a reasonable basis to deny the claim." *Id.* The court noted that "[a]n injury must arise out of the worker's employment to be compensable," but the injured worker's initial statement was that he was "merely walking when the injury occurred." *Id.* Thus, the court concluded that the insurer reasonably concluded, at least initially, that the worker's knee injury only "coincidentally" occurred at work, but was not work-related. *Id.* On the other hand, the court found that the insurer later received additional information explaining a treating physician's opinion that the injury was work-related, because the injured worker's job involved heavy lifting activities, which placed him at greater risk for knee injuries. *Id.* at 332. Notwithstanding the new information, the insurer continued to deny the claim without conducting any further investigation. *Id.* at 332-33. The Iowa Supreme Court concluded that, on the basis of this

42

evidence, the trial court had properly denied the insurer's motion for summary judgment on the injured worker's bad faith claim:

> Although the new information provided in the deposition did not necessarily render the compensability issue undebatable, it did transform the reasonableness of the continued denial by [the insurer] into a jury question. The reasonableness of the denial of a workers' compensation claim by an insurer is a question of law only when the evidence is undisputed and only one inference can be drawn from the evidence. The facts of this case were undisputed, but the inferences were not.

*McIlravy*, 653 N.W.2d at 333.

Similarly, in Niver's case, "information gathered from the initial interview of [Niver] gave [Travelers] a reasonable basis to deny the claim." *Id.* at 331. Niver's initial statement reasonably indicated an onset of groin pain *before* he returned to work after knee surgery. It also reasonably suggested—or could reasonably have been misunderstood to suggest—that Niver had experienced the groin pain while exercising. Thus, as in *McIlravy*, the insurer had a reasonable basis, at least initially, to debate whether the groin pain was work-related or work-aggravated. *Id.* However, the notes from Niver's groin surgery in December 2000 demonstrated that the most likely cause of the groin pain was the apparent neuroma and scar tissue resulting from the 1995 hernia surgery. Furthermore, the post-surgery pathology report confirmed the neuroma, and subsequent medical records focused on the 1995 hernia surgery as the cause or primary cause of the October 2000 groin pain. Travelers received this information between March 14, 2001, and July 2001. At a minimum, if these surgery and post-surgery records did not render the compensability issue "undebatable," at the very least, they "did transform the reasonableness of the continued denial by [Travelers] into a jury question." *Id.* at 333.

However, unlike the situation in *McIlravy*, this court finds that, as a matter of law, these surgery and post-surgery records and other medical records available to Travelers by July 2001 *did* render the compensability issue "undebatable," because Travelers could no longer "dispute on any logical basis" that *a* proximate cause of Niver's October 2000 groin pain was the neuroma and scar tissue from the 1995 hernia surgery, even if the medical records recognized other possible causes as well. *See Bellville*, 702 N.W.2d at 473 ("A claim is 'fairly debatable' when it is open to dispute on any logical basis."). Niver was not required to show that the 1995 hernia was the *sole* proximate cause of his October 2000 groin pain, only that it was *a* proximate cause of that pain. *See, e.g., Ward v. Iowa Dep't of Transp.*, 304 N.W.2d 236, 239 (Iowa 1981) (for purposes of workers compensation, "[t]he incident or activity need not be the sole proximate cause, if the injury is directly traceable to it"); *Blacksmith v. All-American, Inc.*, 290 N.W.2d 348, 354 (Iowa 1980) (a workers compensation claimant bears the burden of proving an alleged injury was "a proximate cause of the disability on which the claim is based," and a cause is proximate "if it is a substantial factor in bringing about the result; it need not be the only cause"); *Holmes v. Bruce Motor Freight, Inc.*, 215 N.W.2d 296, 297 (Iowa 1974) (for purposes of workers compensation, "[t]he incident or activity need not be the sole proximate cause, if the injury is directly traceable to it," citing *Langford*, *infra*); *Langford v. Kellar Excavating & Grading, Inc.*, 191 N.W.2d 667, 670 (Iowa 1971) (the trial court improperly required a workers compensation claimant to prove that a work-related accident was the sole proximate cause of his disability, because "this is a greater burden than the law casts upon him"). Travelers has neither generated opinions by its own physicians nor pointed to opinions or records from treating physicians that identify a different cause that *excludes* the 1995 hernia as *a* proximate cause of Niver's October 2000 groin pain, even if the existing records suggest other possible proximate causes *in addition to* the surgery for the

1995 hernia.  Nor are references to the surgery for the 1995 hernia as a "possible" cause of the October 2000 groin pain the basis for "fair debate," because Niver also presented medical evidence that the surgery for the 1995 hernia was a "probable" cause of the later groin pain.  *See, e.g., Wendland v. Sparks*, 574 N.W.2d 327, 330 (Iowa 1998) (noting that the "traditional requirement" for proximate cause is that something was "probably" the cause, citing *Bradshaw, infra*); *Bradshaw v. Iowa Methodist Hospital*, 251 Iowa 375, 383, 101 N.W.2d 167, 172 (1960) ("[M]edical testimony [that] it is possible [that] a given injury was the cause of subsequent disability or 'could have' caused it is insufficient. . . . Testimony indicating *probability or likelihood* of such causal relation is necessary.") (emphasis added).  Specifically, by letter dated March 26, 2001, and provided to Travelers, Dr. William J. Pierce, who had treated Niver for groin pain at the Mason City Clinic opined that the groin pain was "probably a result of scar tissue and/or nerve entrapment in the area of the previous surgery," and that Niver "would probably not have had his groin pain requiring exploration of the previous incision for scar release." Defendant's Appendix at 97.  Thus, medical evidence that the "probable" cause of Niver's groin pain was the surgery for the 1995 hernia was known to Travelers and Travelers has not adequately disputed that evidence, for example, with evidence from any expert of its own, to the effect that the surgery for the 1995 hernia *was not* and *could not* have been a cause of the later groin pain.

Thus, unlike the situation in *McIlravy*, not only was the evidence undisputed, but only one inference could be drawn from that evidence.  *Compare McIlravy*, 653 N.W.2d at 333 (holding that the evidence was undisputed, but the inferences were not, so that there was a jury question on whether the claim was "fairly debatable").  That undisputed inference is that the surgery for the 1995 hernia was at least *a* proximate cause of the October 2000 groin pain.  Under these circumstances, the court can decide the

45

reasonableness of Travelers's denial of Niver's workers compensation claim as a matter of law, *McIlravy*, 653 N.W.2d at 333, and as a matter of law, there was no reasonable basis for Travelers's denial of that claim.

To put it another way, the record is such that the court *could* grant a "directed verdict" on Niver's claim for benefits, were that claim now before the court, so that, even if some form of the "directed verdict" rule applies after the decision in *Bellville*, that rule stands as no general or automatic bar to Niver's bad faith claim. *See Bellville*, 702 N.W.2d at 474 (the insurer should generally be entitled to a directed verdict in its favor on the insured's bad faith claim, unless the insured is entitled to a directed verdict in his favor on the policy claim, but the existence of a submissible jury question on the insured's entitlement to policy benefits *does not automatically* establish that the insurer is entitled to judgment as a matter of law on the insured's bad faith claim).

Therefore, Niver, rather than Travelers, is entitled to summary judgment on the first element of his bad faith claim.[4] *See* FED. R. CIV. P. 56 (a party may move for, and the court may grant, summary judgment "as to all or any part" of the claims at issue).

### b. *The subjective element*

As framed in the *Bellville* decision, the second, subjective element of a first-party bad faith claim requires the plaintiff to prove that "the [insurer] knew or had reason to know that its denial or refusal was without reasonable basis." *Bellville*, 702 N.W.2d at 473 (citing *Sampson*, 582 N.W.2d at 149, and *Reuter*, 469 N.W.2d at 253). In this case, there can be no dispute that adjustors for Travelers knew by July 2001 that Niver's claim

---

[4]To the extent that the court has not expressly addressed each of Travelers's arguments for summary judgment in its favor on this element or for denying summary judgment in Niver's favor on this element, the court has considered and rejected those arguments.

for groin pain in October 2000 should have been paid under the 1995 hernia claim, *i.e.*, that Travelers's continued denial of the claim was without reasonable basis. Again, adjustors' notes dated July 10, 2001, in the claim files for both the October 2000 claim and the 1995 claim state that everything about the October 2000 groin pain, including medical records, related back to the 1995 claim. Defendant's Appendix at 3 (1995 claim notes stating, "[Injured worker] has new claim of 10-00 for an alleged incident causing a hernia but in all the medical he doesn't mention a new indicent [sic] but rather relates everything back to this claim.") & 19 (October 2000 claim notes stating, "All of the medical is relating the problems back to an old hernia claim that was closed in 1996."). A claim note from July 19, 2001, in the 1995 claim notes memorializes an adjustor's query to Curries as to why medical benefits for the October 2000 claim had not been paid pursuant to the 1995 hernia claim, "when the newer claim was denied and all the medical was indicating the symptoms were related to this hernia claim. . . ." Defendant's Appendix at 3. Further claim file notes dated October 26, 2001, February 18, 2002, and May 21, 2002, also indicate that Niver's claim for the October 2000 groin pain "should have" been paid pursuant to the 1995 hernia claim. *See* Defendant's Appendix at 4 & 7.

Therefore, Niver, not Travelers, is also entitled to summary judgment on the second element of his first-party bad faith claim. *See* FED. R. CIV. P. 56 (a party may move for, and the court may grant, summary judgment "as to all or any part" of the claims at issue).

### D.  Remaining Issues For Trial

As Niver recognizes, summary judgment in his favor would leave for trial the question of damages on his bad faith claim in Count I of Niver's Complaint, which alleges Travelers's bad faith failure to pay workers compensation benefits for the October 2000 groin pain pursuant to the 1995 hernia claim. *See id.* (the court may grant summary

judgment on only part of a claim).  Moreover, while Count III, which alleges Travelers's bad faith appeal of the administrative decision, could have survived separately if Niver was not entitled to summary judgment on Count I, because it involved an allegation of *subsequent* bad faith, the court believes that summary judgment in Niver's favor on his bad faith claim in Count I of his Complaint "moots" or subsumes Niver's separate bad faith claim in Count III.  This is so, because any damages for bad faith in subsequently pursuing the administrative appeal would be compensable pursuant to Count I, if the administrative appeal was founded on Travelers's continued assertion that it had a reasonable basis to deny the underlying workers compensation claim.  On the other hand, Travelers would be entitled to argue that Niver is not entitled to any damages arising from the administrative appeal pursuant to Count I, if the administrative appeal was premised on the miscalculation of damages or any other issues that had nothing to do with a continued assertion that the underlying workers compensation claim was "fairly debatable."  Certainly, the parties have not argued that Count III survives if Niver is entitled to summary judgment on Count I.[5]

Therefore, because the court grants Niver's motion for summary judgment on Count I of his Complaint, and denies Travelers's motion for summary judgment, this matter will proceed to trial only on the issue of Niver's damages, including his claim for exemplary damages in Count II, from Travelers's bad faith failure to pay his claim for medical benefits for his October 2000 groin pain pursuant to the 1995 hernia claim.

---

[5]Indeed, the court finds no more than passing references to the allegation that Travelers pursued the administrative appeal in bad faith in any of the parties' submissions on the summary judgment motions.

### III. CONCLUSION

Upon the foregoing, the court concludes that, contrary to Travelers's contentions, the Iowa Supreme Court's decision in *Bellville v. Farm Bureau Mutual Insurance Company*, 702 N.W.2d 468 (Iowa 2005), did *not* establish new standards for the first element of a first-party bad faith claim, at least not in any respect that is relevant here. Even assuming, in the alternative, that the *Bellville* decision did modify the standards applicable to such a claim, the modification did not go nearly so far as Travelers contends. Instead, at most, the "new" rule in *Bellville* is that the insurer *should generally be* entitled to a directed verdict in its favor *on the insured's bad faith claim*, unless the insured is entitled to a directed verdict in his favor *on the policy claim*, but the existence of a submissible jury question on the insured's entitlement to policy benefits *does not automatically* establish that the insurer is entitled to judgment as a matter of law on the insured's bad faith claim. *See Bellville*, 702 N.W.2d at 474.

On the present record, however, the court finds, as a matter of law, that there can be no genuine dispute that, as of July 2001, Travelers no longer had any logical basis upon which it could "fairly debate" Niver's claim for medical benefits for his October 2000 groin pain under the 1995 hernia claim, such that any "directed verdict" rule adopted in *Bellville* does not bar Niver's bad faith claim. Moreover, the court finds that, as of the same date, as a matter of law, Travelers knew that it had no reasonable basis to deny Niver's claim. Consequently, the only remaining issue for trial is Niver's damages arising from Travelers's bad faith denial of his claim for workers compensation benefits.

THEREFORE,

1.      Travelers's November 23, 2005, Second Amended And Substituted Motion For Summary Judgment (docket no. 163) is **denied**.

2. Niver's December 15, 2005, Motion For Summary Judgment (docket no. 165) is **granted** on his claim in Count I of his Complaint to the extent that the court finds, as a matter of law, that Travelers could not "fairly debate" that Niver was entitled to workers compensation benefits for the October 2000 groin pain pursuant to the 1995 hernia claim as of July 2001 and that Travelers did, in fact, know that it had no reasonable basis to deny the claim at that time.

3. In light of the summary judgment granted in paragraph 2, Count III of Niver's Complaint is dismissed as moot.

4. This matter shall proceed to trial on March 6, 2006, on the issue of Niver's damages arising from Travelers's bad faith denial of his claim for workers compensation benefits in Count I, including Niver's claim in Count II for exemplary damages for the intentional, reckless or willful and wanton disregard of Niver's rights under the Workers Compensation Act.

**IT IS SO ORDERED.**

**DATED** this 6th day of February, 2006.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA